# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| JAMES GARRETT FREEMAN,<br>Petitioner, | §<br>§<br>§ | |
| VS. | §<br>§ | CIVIL CASE NO. 12-3784 |
| WILLIAM STEPHENS,<br>Director, Texas Department of<br>Criminal Justice, Correctional<br>Institutions Division,<br>Respondent. | §<br>§<br>§<br>§<br>§<br>§ | |

## MEMORANDUM AND ORDER

James Garrett Freeman, a Texas death-row inmate, seeks federal habeas relief on a single issue: whether his trial attorneys provided constitutionally effective assistance. The respondent, William Stephens, has moved to dismiss. The pleadings, the motions and briefs, the record, and the applicable law lead the court to grant the respondent's motion, to deny Freeman's petition, and to dismiss the case by separate order. The reasons for these rulings are set out below.

## I.    Background

The Texas Court of Criminal Appeals summarized the underlying facts in its opinion affirming the capital conviction and sentence as follows:

> On Friday, March 16, 2007, Texas Game Warden Jonathan Blackburn was conducting surveillance in an area where residents had complained of shots being fired at night. He parked his truck on the side of the road with its lights off, and around 11:00 p.m., he saw a truck driving very slowly in his direction. He heard a single gunshot, which he thought came from a .22 caliber or smaller rifle. Blackburn intended to investigate the shot because it is illegal to fire shots or hunt from the side of the road. Blackburn drove toward the truck and activated his "red and blue lights" and in-car video camera system when he was within thirty to forty yards of it. The truck continued driving toward Blackburn, and rather than stopping when Blackburn activated his lights, the truck "sped off" once it passed him. Blackburn did not recognize the driver at that time and described him as a white or Hispanic male with a goatee and wearing a stocking cap.

Blackburn followed the fleeing truck down several gravel and paved roads at speeds ranging from 45 to 100 miles per hour (mph). He requested backup from the Wharton County Sheriff's Office. Constable John Szymanski and Deputy Constable Jeremy Hyde joined the pursuit in their marked patrol car with lights activated and took over the lead from Blackburn because their car was faster than Blackburn's truck. The constables' patrol car followed the fleeing truck at speeds up to 130 mph on the paved roads. They were joined by Deputies Mark Tijerina, Roddy Rodriguez, and Chris French, all in marked patrol cars with lights activated. It was obvious to Blackburn that the driver knew the area and was familiar with the roads, and eventually Blackburn realized that the driver of the fleeing truck was traveling in a circular route back to near where the pursuit began.

Not yet a part of the pursuit, Texas Game Warden [Justin] Hurst communicated that he was going to attempt to set up a roadblock at an intersection. The fleeing driver was able to steer his truck around the roadblock without going into the ditch but sideswiped Hurst's truck in the process. Hurst joined the pursuit, which continued for approximately another 30 minutes on predominately gravel roads. According to Blackburn, there was no viable spot to force the driver to stop. The law enforcement officers were forced to follow and wait. Texas Department of Public Safety (DPS) troopers and the constables attempted to deploy spike strips several times, but the driver of the fleeing truck managed to avoid the spikes each time.

By this time, the dispatcher had completed a check on the fleeing truck's license plates. The license plates identified the truck as being registered to [Freeman]. Blackburn and Szymanski were familiar with [Freeman]. Blackburn had written him a ticket the previous year without incident but had not recognized him as the driver of the truck when the pursuit began. Officers believed the truck was stolen because the behavior of the driver was not consistent with what they knew about [Freeman]. [Freeman], however, was later identified as the driver.

Eventually, [Freeman] drove over a set of spikes deployed by a DPS trooper. [Freeman] steered his disabled truck into a driveway in front of the Lissie Cemetery. He parked the truck with the driver's side door away from the pursuit vehicles, putting the truck between himself and the law enforcement officers. Blackburn and Rodriguez believed, as they parked their own vehicles, that [Freeman] would attempt to flee. However, as [Freeman] exited his truck, he began firing a handgun at officers. According to Blackburn, [Freeman's] manner was aggressive, and he took a protected position from which he could see the three officers in front. [Freeman] continued to shoot the handgun until it seemed to be out of ammunition, and the officers returned fire. [Freeman] "disappeared" for a "second" and "[came] back out with a long gun" that Blackburn identified as a semi-automatic rifle by the number of shots fired. Tijerina, who was trapped in his patrol car, immediately recognized

the rifle as an AK–47 assault rifle and realized that his car would offer little protection from the rifle's bullets. Officers retreated to the backs of their vehicles for better cover. [Freeman] never exposed himself to open fire or moved out from behind the bed of his truck as he shot at officers. It "seemed to [Tijerina] like he was trying to kill somebody."

Blackburn watched as Hurst left his cover and moved into the open where he had a clear shot at [Freeman]. Hurst fired at [Freeman] from a low, crouched position while other officers were not able to return [Freeman's] fire. [Freeman] saw Hurst, aimed the rifle at him, and shot. Blackburn did not actually see Hurst fall when [Freeman] shot at him but saw him lying face down on the ground afterward. Blackburn initially thought that Hurst was taking a more protected position flat on the ground but soon realized that he had been shot. Hurst died from a penetrating gunshot wound in his left arm and torso.

*Freeman v. State*, 340 S.W.3d 717, 720–22 (Tex. Crim. App. 2011) (footnote omitted). Freeman finally stopped shooting and began running away. He carried weapons with him and held them while the police shot him. The State of Texas charged Freeman with killing a peace officer in the course of his duties. TEX. PENAL CODE § 19.03(a)(1).

## II.     Trial Counsel's Trial Preparation and Performance

Trial began in May 2009. Freeman had retained Stanley Schneider, "an experienced criminal defense attorney with an excellent reputation," and Lee Cox, also an experienced defense attorney, to represent him. State Habeas Record at 426.[1] Trial counsel faced the challenge of extensive evidence supporting a conviction for capital murder. The prosecution could — and did — paint the picture that Freeman had set the stage and prepared his weapons "for what he's intending to do." Tr. Vol. 30 at 76. The prosecution had a ready motive — Freeman knew that he would be sent to prison if the officers apprehended him, so he began shooting in hopes of getting away. The fact that Freeman used different weapons, including an assault rifle, to shoot over thirty bullets, showed

---

[1]      Freeman's trial attorneys are collectively referred to as "trial counsel."

murderous intent. The record contained no sign of remorse. The defense did not have an easy task, but Freeman proceeded to trial.

The record contains no affidavit or other statement from trial counsel describing trial preparation work. A review of the record, however, provides general insight into trial counsel's strategic choices. The trial transcript shows that Freeman's counsel focused on trying to convince jurors that he lacked the intent to commit capital murder. The defense's closing arguments made this clear: "[Freeman] is not guilty of capital murder. He may be guilty of something else. He probably is guilty of something else. But what result did he want to occur?" Tr. Vol. 21 at 57.

In Texas, capital murder requires intentionally or knowingly causing the death of a peace officer acting in the lawful discharge of an official duty. TEX. PENAL CODE § 19.03(a)(1). Under Texas law, "[i]ntent may . . . be inferred from circumstantial evidence such as acts, words, and the conduct of [the defendant]." *Guevara v. State*, 152 S.W.3d 45, 50 (Tex. Crim. App. 2004). Texas law allows a jury to find the specific intent to kill from the use of a deadly weapon, "unless in the manner of its use it is reasonably apparent that death or serious bodily injury could not result." *Godsey v. State*, 719 S.W.2d 578, 581 (Tex. Crim. App. 1986); *see also Jones v. State*, 944 S.W.2d 642, 647 (Tex. Crim. App. 1996).

Trial counsel presented two related arguments that Freeman did not intend to kill when he fired his weapon: (1) although Freeman acted desperately and impulsively when he ran from his vehicle, he did not shoot directly at the officers; and (2) Freeman's depression and alcohol abuse made his behavior reckless and suicidal. Trial counsel argued that Freeman shot at the police cruisers and did not specifically aim at the officers. The defense conceded that "[t]here is plenty of evidence that he shot at cars, shot in the direction of people," but argued that he did not aim at

4

officers or intend to hit them. Tr. Vol. 30 at 38. Freeman was a skilled marksman and, according to defense counsel, had he shot to kill, his initial shots would have been deadly. Tr. Vol. 30 at 35. Trial counsel also tried to establish that Freeman could not have seen the victim from where he was firing and therefore could not have intended to kill him. "[W]e know he shot in the direction of officers and not at officers." Tr. Vol. 30 at 30.

Freeman's postjudgment challenges focused on counsel's second defensive theory, the one characterized at trial as "death by indifference or law enforcement assisted suicide." Tr. Vol. 21 at 40. To explain why Freeman began firing at the police officers, trial counsel "attempt[ed] to show that [his] life was in a downward spiral as a result of a severe depression, which was manifested by his heavy alcohol use, loss of job, failure to abide by rules of probation and statements to friends that he wanted to 'check out.'" (Docket Entry No. 10 at 4); *see also* Tr. Vol. 21 at 38–57 (trial counsel's opening statement summary of what the defense believed the evidence would show). Trial counsel argued that Freeman knew that if the police found him with the weapons, he would be sent to prison for violating his probation. Counsel argued that Freeman, depressed and desperate, began shooting toward the police officers, hoping that the officers would shoot and kill him. The defense argued that the police video tape of the shootout showed at least four times when Freeman positioned himself where the police could have hit him. Trial counsel hoped that jurors would conclude that as to whether Freeman knowingly or intelligently killed the officer, there was room for reasonable doubt. "When you want to die and you want to be killed by the police, was that an intent to kill?" Tr. Vol. 21 at 39.

In preparation for trial, the defense retained an investigator and three expert witnesses: Dr. Jerome Brown, a licenced clinical psychologist; Dr. Daneen Milam, a licenced neuropsychologist;

and Dr. Vivian Lord, a licenced psychologist and former police officer who specialized in the area of "suicide by cop." The investigator and Dr. Brown laid a groundwork for the suicide-by-cop theory. Dr. Brown had interviewed Freeman, administered psychological tests, and talked with his family members. Dr. Brown found no evidence of severe psychological problems or mental-health concerns. Tr. Vol. 27 at 190. Instead, he observed "mild to moderate levels of depression" about a month after the shooting. Tr. Vol. 27 at 190. Dr. Brown explained to the jury that Freeman had been depressed for some time. As Freeman felt like his life "worsen[ed] . . . he became more depressed," was more irritable, and was "trying to withdraw and avoid problems." Tr. Vol. 27 at 195, 203–04. The depression worsened and Freeman began experiencing suicidal ideation. Tr. Vol. 27 at 190–91. With deepening feelings of depression and hopelessness as "his life was unraveling," Freeman "was moving toward a suicidal state of mind." Tr. Vol. 27 at 191–92. Dr. Brown explained that the suicidal thoughts at that point were "not strong. They [were] not powerful yet . . . and he [did not] have a plan yet," but these thoughts contributed to Freeman's impulsive response when the police officers confronted him. Tr. Vol. 27 at 192. Freeman's "ongoing depression or depressing process that was existing some time before" combined with his alcohol abuse and resulted in "extremely impulsive . . . reckless, terrible, violent behavior." Tr. Vol. 27 at 197-99. Freeman's behavior was of the type "exhibited by people who have become suicidal enough to no longer care." Tr. Vol. 27 at 197–99. Freeman "jump[ed] out of the truck and start[ed] shooting . . . without any understanding . . . or thinking about the consequences of what he'[d] gotten himself into." Tr. Vol. 27 at 198.

Dr. Brown testified that just before the police confrontation, Freeman probably did not want to commit suicide, although he was headed in that direction. But the confrontation, which he did not

initiate or control, moved him further to that end, so that he did not care if he was killed. Dr. Brown summarized Freeman's thinking as along the lines of, if they kill me, they kill me. Tr. Vol. 27 at 208. Dr. Brown's testimony laid the groundwork for the core of the defense's suicide-by-cop theory. Dr. Lord put that theory before the jury.

Dr. Lord had extensive experience researching and identifying what "occur[s] when an individual appears to provoke law enforcement officers to induce them to shoot and kill him." State Habeas Record at 425. Based on examining Freeman's life history, reviewing interviews with family members and friends, and talking with Freeman, Dr. Lord testified that Freeman had "a number of personal, historical, and behavior indicators that were similar" to people who encouraged the police to shoot them. Tr. Vol. 29 at 54. She particularly noted that Freeman had previously made statements about his "suicide ideology that would be common in other suicide by cop . . . cases [she] ha[d] studied." Tr. Vol. 29 at 42. The fact that Freeman had family members who had committed suicide "put him kind of moving over that line from, oh yeah, people out here sometimes kill themselves to people I know, people that I like, [people] that I accept, kill themselves." Tr. Vol. 29 at 44. That thinking "almost begins to kind of give permission a little for suicide." Tr. Vol. 29 at 44. Freeman "kind of thought about" suicide-by-cop in explicit terms after he saw a television program about it.

Dr. Lord also testified that "some characteristics [of the shooting] were similar to these other suicide by cop incidents." Tr. Vol. 29 at 54. The pattern of engaging in a criminal act that precipitated the police attack, abusing alcohol, feeling hopeless, and threatening police officers was common to suicides by police. Tr. Vol. 29 at 45–49. Dr. Lord testified that Freeman must have known "while engaging in life-threatening behavior towards law enforcement" and "facing five, six

7

law enforcement cars, that there are a number of individuals who could have an opportunity to take him out." Tr. Vol. 29 at 42. Dr. Lord's review of the videotape of the shootout led her to conclude that Freeman had left himself "clearly exposed enough that he could have been shot and killed." Tr. Vol. 29 at 40. She concluded that the circumstances were consistent with an attempted suicide by cop.

On cross-examination, Dr. Lord testified that she had not reviewed Dr. Brown's notes. The notes reflected that Freeman had told Dr. Brown that the police shot him once after he began firing. After that, Freeman said: "I didn't care. They got shot because I was mad about being shot." Tr. Vol. 28 at 83–84. Freeman also told Dr. Brown that he was not drunk on that night and that he had been trying to flee from the officers. Tr. Vol. 29 at 87–88. Dr. Lord was also cross-examined with Freeman's statement to a nurse treating him just after his arrest that he was not depressed. Tr. Vol. 29 at 80–81. The prosecution challenged Dr. Lord's assumptions about the crime and questioned whether she had misrepresented Freeman's intent. The prosecution asked: how "does someone want to be killed by the cops if they're running away from them with an AK-47?" Tr. Vol. 29 at 65.

The defense brought its strategy together in the closing arguments for the liability part of the trial. Counsel painted a bleak picture of Freeman's deepening depression and alcohol abuse leading up to the shooting. As his life entered a "downward spiral" of "increased drinking," his depression made him act impulsively. When Freeman ran out of his vehicle, he had "no planned intent." Tr. Vol. 30 at 30. Trial counsel argued that the evidence showed that Freeman did not shoot at the police officers, but instead "toward the police cars . . . shooting in the direction of the police cars." Tr. Vol. 30 at 26. Trial counsel summarized:

Not every time a police officer dies in the line of duty is the person responsible guilty

of capital murder. . . . [Freeman] was reckless. [Freeman] shot in the direction of people. But the State has presented no evidence, no evidence of his intent. What result did he want to occur? None.

There is plenty of evidence that he shot at cars, shot in the direction of people. But . . . he couldn't see Justin Hurst. He didn't know who was out by the fence. . . . . Then into the darkness [] Freeman fired. This is not a decision you — this is not an emotional decision. This is a decision you make on reason.

Tr. Vol. 30 at 38. Trial counsel argued that the jurors should have a reasonable doubt about whether Freeman intended to kill.

The jury found Freeman guilty of capital murder, answering "yes" to the special issue asking whether Freeman was a future threat to society, and "no" to the special issue asking whether mitigating circumstances warranted a life sentence. Clerk's Record at 5471–72. On direct appeal, the Court of Criminal Appeals described the punishment phase as follows:

The jury heard a variety of testimony during the punishment phase. Over forty witnesses testified on [Freeman's] behalf. His former employer and teachers, friends, customers of his father's welding shop, family members, and friends' parents all described [Freeman] as polite and respectful. Former teachers testified that he was an average student, quiet, and had no discipline problems. Customers told the jury that [Freeman] was earnest and courteous. The defense witnesses testified that this offense was completely out of character for [Freeman] and that they were shocked he was involved. The arresting officers in this case testified that [Freeman] was cooperative once he was in custody, and jailors testified that [Freeman] was peaceful and had no disciplinary problems while awaiting trial.

On cross-examination, however, there was testimony that [Freeman] was easily irritated and angered and quick-tempered. His temper was unpredictable, and he had inappropriate reactions to stressful circumstances. Additionally, the jury learned that the neuropsychologist, Dr. Daneen Milam, was told that when [Freeman] lost his temper and had an outburst, it would seem like he was unable to hear what anyone was saying to him. Several defense witnesses also described how [Freeman's] behavior had changed in the months preceding the offense. They described [Freeman] as becoming withdrawn and not participating in activities as he once had.

According to Milam, who interviewed and tested [Freeman], he was not exhibiting signs of depression at the time of his interview. However, in her review of prior

9

interviews and records, she saw a pattern of clinical depression beginning about a year before the offense. Milam also testified that she found no evidence of brain damage and that, by all accounts, [Freeman] had a happy childhood. Milam told the jury that [Freeman] had a progressive history of alcohol abuse, evidenced by his history of alcohol-related incidents, which included a Minor in Possession citation and a Minor Driving Under the Influence citation.

Various law enforcement officers testified that [Freeman] had also been cited for driving his all-terrain vehicle on the roadway and in a creek bed, for speeding 114 mph in a 70 mph zone, and for having an illegal tint on his truck windows. At the time of the offense, [Freeman] was serving a probated sentence for DWI, but he had not been successfully completing the terms of his probation. He had been notified by his probation officer that a motion to revoke his probation would be filed. According to Milam, [Freeman] stated that he "didn't care whether [he] lived or died." He related to Milam that he had a short temper and would do things such as throwing a hammer to relieve stress, but that while such actions relieved some of his stress, they did not solve any of his problems.

The jury learned during the guilt phase that [Freeman] had reported to Dr. Jerome Brown that he shot at the officers because he was mad. While [Freeman] told Texas Ranger David Maxwell that he felt terrible that he had killed the game warden, Maxwell testified that [Freeman] did not seem remorseful. [Freeman's] answers to an anger-control survey revealed that he had "snapped" and broken things while angry. [Freeman] also related on the survey that he had done things in anger that he was unable to remember the next day. On the Inventory of Offender Risk, Needs, and Strengths (IORNS test), [Freeman] scored high in the areas of irresponsibility, manipulativeness, angry detachment, and hostility.

The jury also had before it the facts of the offense. Rather than pulling over when Blackburn activated his red-and-blue lights, [Freeman] sped away, leading Blackburn and other officers on a chase that reached speeds of 130 mph. Once officers successfully disabled [Freeman's] truck, rather than stopping and peacefully surrendering, [Freeman] exited his truck and fired a handgun at officers. [Freeman] then deliberately exchanged his handgun for a semi-automatic assault rifle. He raised the assault rifle to his shoulder and began firing at officers with metal-piercing bullets. [Freeman] then aimed his rifle at Justin Hurst and fired. Hurst did not survive.

*Freeman*, 340 S.W.3d at 725–26.

The jurors' answers required the death sentence. Clerk's Record at 5471–73.

## III.    The State Postjudgment Proceedings

The state trial court denied Freeman's motion for new trial without holding a hearing. Through appointed counsel, Freeman raised twelve points of error on direct appeal. The Court of Criminal Appeals affirmed his conviction and sentence in a written opinion on March 16, 2011. *Freeman*, 340 S.W.3d at 717. The United States Supreme Court denied Freeman's petition for certiorari review. *Freeman v. Texas*, — U.S. —, 132 S. Ct. 1099 (2012).

The direct appeal and habeas actions proceeded concurrently, as Texas law provided. Freeman's counsel on his state habeas proceeding, John E. Wright, filed an application raising several grounds for relief, including that the trial attorneys provided ineffective assistance because "suicide by cop is not a reasonable trial strategy" and "is not a defense recognized by our law." State Habeas Record at 30. The application argued that the defense "did not give a juror a reason to acquit a defendant of capital murder, consider a lesser included offense, or offer a mitigating circumstance that might be sufficient to warrant a life sentence rather than a death sentence." State Habeas Record at 30.[2] Instead of challenging the specific intent to kill, on state habeas, counsel argued that Freeman's trial attorneys should have challenged *his ability to form* a specific intent to kill. The habeas application argued that:

> [h]ad the defense team better understood what was wrong with [Freeman], they likely would not have presented the theory of suicide by cop at the guilt phase. Instead, [Freeman's] faintly expressed suicide ideations would have served to support one of the real reasons for his conduct on the night in question — he was severely depressed

---

[2]     Freeman also argued that to the extent "suicide by cop" could be a valid defense, trial counsel had not given the experts enough information to make it effective. Freeman argued that trial counsel should have given the mental-health experts background about his family history of alcohol abuse and mental problems, his exposure to toxins while welding and cleaning his guns, and the resulting "[i]mpaired brain functions in key executive and decision-making systems of the brain that significantly diminished Freeman's ability to act rationally during the events of the crime." State Habeas Record at 36.

and his judgment was impaired, influenced by alcohol and Varsol,[3] and he was suffering from life long exposure to toxic chemicals that likely damaged his brain.

State Habeas Record at 91. State habeas counsel argued that trial counsel should have told jurors

that severe depression, impaired mental faculties from toxin exposure, underlying mental illness

shared with generations of family members, and alcohol dependence all combined to prevent him

from forming an intent to kill. State habeas counsel also faulted trial counsel for not using that same

information to "send the jury a coherent message that could be used to support a life verdict." State

Habeas Record at 34. Freeman summarized his argument and the defense he argued that trial

counsel should have presented, as follows:

> had trial counsel identified that information, the defense could have selected a much
> more believable and persuasive mitigation theme: inherited predisposition to mental
> illness and alcoholism combined with chronic exposure to toxic chemicals from
> infancy into adulthood the presence of at least 3 mental disorders (Alcohol
> Dependence, a Neurocognitive Disorder, and either a Major Depressive Disorder or
> a chronic Dysthymic Disorder) combined with contemporaneous exposure to a
> combination of Varsol and a moderate amount of alcohol that significantly adversely
> affected [Freeman's] ability to make rational choices during the incident in question.

State Habeas Record at 37.

For the first time on habeas review, Freeman also asserted that he had blacked out and could

not remember shooting at the police officers. Freeman argued that trial counsel should have

developed evidence "showing a lack of memory of the crime facts," which, when "coupled with

[Freeman's] history of failing to remember events that occurred while he was angry," should have

prompted trial counsel to present a theory that "the murder of the game warden may have been done

during a brain seizure." State Habeas Record at 95–96. Freeman supported that theory with

---

[3]     Varsol is "a chemical compound Mr. Freeman used to clean his guns on the day of the offense." (Docket Entry No. 32 at 21).

affidavits from family members stating that his relatives had mental problems and epilepsy. In the penalty phase, the blackout evidence would have been part of a defense focusing on "inherited mental illness, childhood toxic exposure, and alcohol . . . providing the jury with an explanation for [Freeman's] acts" and "provid[ing] a credible narrative to explain [his] lack of motivation, and anger." State Habeas Record at 96.

Freeman supported his habeas arguments with affidavits from three mental-health experts: Dr. Patricia Perez-Arce, an expert in toxic exposure and its effect on human behavior; Dr. Robert L. Smith, an expert in addictions; and Dr. Susan Stone, a psychiatrist. The state habeas court found no controverted, unresolved factual issues needing resolution through an evidentiary hearing. State Habeas Record at 359–60. As a result, the state habeas court based its decision on the trial record and the affidavits Freeman filed.

Dr. Smith had interviewed Freeman at the Polunsky Unit, reviewed the state court records, and interviewed six of Freeman's close family members. In his affidavit, Dr. Smith gave "his professional opinion with a reasonable degree of psychological certainty that Mr. Freeman was, at the time of the instant offense, suffering from two psychological disorders: a severe, chronic form of depression, Dysthymic Disorder, and Alcohol Dependence." Dr. Smith described Dysthymic Disorder, or Dysthymia, as "a longstanding depression."[4] Dr. Smith found it "puzzling" that the trial experts did not reach a diagnosis of Dysthymic Disorder given their observations of Freeman's depression and suicidal ideation. While the testing by Dr. Brown was "consistent with a chronic

---

[4]     According to the respondent's brief, that "Dysthymic Disorder is a major depressive disorder where the key feature is that the depression lasts for two years without a significant interruption." (Docket Entry No. 21 at 22) (quoting Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 376–81 (4th ed. 2000)).

13

depression of less severe symptoms than Major Depressive Disorder," it was still "clearly consistent with a diagnosis of Dysthymia." Because Dr. Brown and Dr. Milam did not "conduct significant collateral interviews" and did not "review Mr. Freeman's depressive symptoms and the DSM IV-TR criteria for Dysthymia," they failed to make that diagnosis.[5]

In her affidavit, Dr. Perez-Arce stated her opinion on Freeman's state of mind when the shootings occurred. Dr. Perez-Arce relied on Dr. Smith's report, numerous documents, an eight-hour interview with Freeman, information from his parents, and a neuropsychological evaluation. Dr. Perez-Arce concluded that Freeman suffered a "Major Depressive Disorder, a significantly incapacitating mental disorder with its own adverse effects on cognitive functioning and activities of daily living." State Habeas Record at 175. Dr. Perez-Arce also concluded that Freeman had experienced long-lasting effects from a 2003 head injury, contributing to his impaired "executive and memory functions." State Habeas Record at 175. Dr. Perez-Arce stated that Freeman's condition became "significantly more disabling" when combined with alcohol abuse and "the adverse cognitive mood and anxiety effects" of regular exposure to neurotoxins and metals, particularly manganese, from working in his father's welding shop. State Habeas Record at 175. Dr. Perez-Arce concluded that the inhibited executive functions "would [not] have allowed him to think rationally." Instead, when confronted by the police officers, "he experienced a 'fight or flight' response and engaged in automatic and overlearned behaviors in wielding and using his guns, in the dark, and without focus. Due to his compromised, diminished levels of brain function in key executive systems, he was unable to appraise his responses rationally and make rational choices." State Habeas

---

[5] Freeman apparently did not submit a paper copy of Dr. Smith and Dr. Stone's affidavits in state court, but provided an electronic copy on a thumbdrive. Freeman has attached both affidavits to his federal habeas petition.

Record at 38.

Dr. Stone's affidavit provided the strongest support for the blackout theory. Dr. Stone did not interview Freeman or any family members. State habeas counsel asked Dr. Stone to review the record and "render an expert opinion as to whether there is a reasonable clinical probability that Mr. Freeman suffers from a previously undiagnosed seizure disorder — specifically, partial complex seizure disorder." Dr. Stone observed that Freeman's family members had experienced seizures and that his exposure to heavy metals from his welding work and to chemicals elevated his risk of seizures. Other family members had "report[ed] periods of dissociation" accompanying their seizures. On that basis, Dr. Stone testified in her affidavit that her "review of the events on the night of the offense raises the possibility of such dissociation — the audio transcript of Mr. Freeman's confessions shows a clear lack of memory about the facts of the crime, which is consistent with such dissociation." Dr. Stone recommended giving Freeman a "24-hour continuous EEG assessment to determine whether epilepsy might have been a factor not raised in his trial." (Docket Entry No. 10, Exhibit D).

Trial counsel's performance is reviewed under *Strickland v. Washington*, 466 U.S. 668 (1984). The issue is whether "a defense attorney's performance f[ell] below an objective standard of reasonableness and thereby prejudice[d] the defense." *Yarborough v. Gentry*, 540 U.S. 1, 5 (2003); *see also Lafler v. Cooper*, 132 S. Ct. 1376, 1384 (2012); *Wiggins v. Smith*, 539 U.S. 510, 520 (2003). The state habeas court identified various reasons for finding that Freeman had failed to show constitutionally ineffective representation at either the liability or penalty phase. The state habeas court emphasized that Freeman's habeas affidavits followed the same general themes as the information trial counsel had presented. The state habeas court found "no significant difference

between the mitigation evidence that the defense presented at trial and the evidence that Freeman claims his trial attorneys should have presented. All of this evidence relates to the same subject matter and theory: Freeman's mental state as a means to mitigate his conduct." State Habeas Record at 427. In general, "Freeman's habeas evidence is of the same basic subject matter (such as alcoholism, depression, lack of rationality, temper and thoughts of suicide) that the jury had before it." State Habeas Record at 427–48.

The state habeas court found speculative Freeman's new argument that epilepsy or a blackout caused or exacerbated by his mental illness, his exposure to toxins, and other factors compromised his ability to form the specific intent to kill. In particular, the state habeas court's review of the record — and the habeas affidavits themselves — revealed evidence that Freeman remembered the details of the murder and was in control of himself as he fired at officers. The state habeas court discounted the general theory of impaired volition because "[t]he State presented credible evidence" that Freeman was "self-assured, aggressive, and unafraid," his "conduct was calculated and deliberate," and he "was in total control of his actions during the chase and the shootout." State Habeas Record at 424–25. The state habeas court found that Freeman "acted deliberately and knew what he was doing," and, in fact, that "he tried to kill other police officers in addition to [the victim]." State Habeas Record at 425. The state habeas court discounted the three mental-health expert affidavits as speculative, unreliable, and not credible. State Habeas Record at 425.

Having considered the new evidence that trial counsel put before the jury, the state habeas court found that "Freeman's trial attorneys' representation was reasonable and did not fall below an objective standard of professional competence, but rather was within the broad range of reasonable professional assistance." State Habeas Record at 426. The state habeas court took into consideration

16

what effect the information presented in the habeas affidavits would have had at Freeman's trial. Given the similarity of the evidence that was presented at trial, and the lack of credibility of the other information in the habeas affidavits, the state habeas court found "insufficient credible evidence to show that further investigation by the defense would have had any appreciable effect on the outcome in this case." State Habeas Record at 426. As a result, the state habeas court concluded that Freeman had not shown either deficient performance or prejudice, and recommended that the Texas Court of Criminal Appeals deny habeas relief. State Habeas Record at 427–28.

On December 12, 2012, the Texas Court of Criminal Appeals adopted the lower habeas court's findings and conclusions. Based on that recommendation, and from its own review, the Texas Court of Criminal Appeals denied habeas relief. *Ex parte Freeman*, No. WR-76,545-01, 2012 WL 6200490 (Tex. Crim. App. Dec. 12, 2012) (unpublished). This federal habeas petition, renewing the ineffective assistance allegations raised in the Texas courts, followed.

## IV. The Applicable Law

The AEDPA "bars relitigation of any claim 'adjudicated on the merits' in state court, subject only to the exceptions in [28 U.S.C.] §§ 2254(d)(1) and (2)." *Harrington v. Richter*, 562 U.S. 86, 131 S. Ct. 770, 784 (2011).[6] Under those provisions, "a federal court cannot grant a petition for a writ of habeas corpus unless the state court's adjudication of the merits was 'contrary to, or involved an unreasonable application of, clearly established Federal law.'" *Berghuis v. Thompkins*, 560 U.S. 370, 390 (2010) (quoting 28 U.S.C. § 2254(d)(1)); *see also Thaler v. Haynes*, 559 U.S. 43, 47

---

[6]      The state court decisions on habeas review did not explicitly mention the federal standard, though its reasoning followed the *Strickland* framework. The decision, however, still merits deference under the AEDPA. *See Richter*, 562 U.S. at 86, 131 S. Ct. at 784 (finding that nothing "require[s] that there be an opinion from the state court explaining the state court's reasoning," and in fact "a state court need not cite or even be aware of [Supreme Court] cases to deserve AEDPA deference").

(2010); *Bell v. Cone*, 535 U.S. 685, 698 (2002); *Early v. Packer*, 537 U.S. 3, 7–8 (2002); *Williams v. Taylor*, 529 U.S. 362, 413 (2000). "The question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable — a substantially higher threshold." *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007); *see also Morrow v. Dretke*, 367 F.3d 309, 313 (5th Cir. 2004); *Foster v. Johnson*, 293 F.3d 766, 776 (5th Cir. 2002). Similarly, federal courts defer to a state court's factual determinations, presuming all factual findings to be correct. *See* 28 U.S.C. § 2254(e)(1),(2).[7]

Under AEDPA, this court's task is to assess whether the state court was reasonable in denying Freeman's *Strickland* claim. While "[s]urmounting *Strickland*'s high bar is never an easy task," a habeas petitioner's duty to "[e]stablish[] that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult." *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010). "The standards created by *Strickland* and § 2254(d) are both 'highly deferential,' and when the two apply in tandem, review is 'doubly' so." *Richter*, 562 U.S. at 86, 131 S. Ct. at 788 (internal citations omitted); *see also Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009).

Freeman argues that trial counsel should have "provided a more believable, persuasive context for challenging the *mens rea* element of capital murder in the guilt/innocence phase." (Docket Entry No. 10 at 17). "Texas law, like that of all American jurisdictions, presumes that a criminal defendant is sane and that he intends the natural consequences of his acts." *Ruffin v. State*, 270 S.W.3d 586, 591–92 (Tex. Crim. App. 2008). Texas law, however, recognizes that "both physical and mental diseases or defects may affect a person's perception of the world just as much

---

[7]      As the same judge presided over the second trial proceedings and the state habeas action, the presumption of correctness for the state habeas factual findings is especially strong. *See Mays v. Stephens*, 757 F.3d 211, 214 (5th Cir. 2014); *Clark v. Johnson*, 202 F.3d 760, 764 (5th Cir. 2000).

as they may affect his rational understanding of his conduct or his capacity to make moral judgments." *Id.* at 593. Texas law allows defendants to present evidence that could create reasonable doubt about whether the State has proven the intent element. *Id.*

Freeman argues that trial counsel chose the wrong defense and should have challenged the intent element of capital murder by developing evidence relating to: (1) his depression; (2) the "effects of toxic chemical exposure in his many years as a welder [and] possible seizure disorder," and (3) his "alcohol dependence." (Docket Entry No. 10 at 17). Freeman argues that trial counsel should have used those themes to present a coherent defensive theory for both the liability and penalty phases of trial.

While not to the extent Freeman has developed on habeas review, trial counsel investigated and presented evidence of Freeman's depression and alcohol abuse as explaining his actions and undermining any intent to kill. The state habeas court found that Freeman augmented, but did not significantly alter, that evidence in the claims and information he presented on collateral review. At both stages of trial, the jury heard experts and Freeman's friends and family members testify about his depression and alcohol abuse. Tr. Vol. 28 at 13–15, 28, 34–35, 160, 164, 175–76. Dr. Brown testified that Freeman's depression impeded "his coping ability" to the point that he exhibited "behavior that's exhibited by people who have become suicidal enough to no longer care." Tr. Vol. 27 at 190, 195–99. While the habeas experts testified that the depression was more severe than the trial experts described, both concluded that the depression and other factors meant that Freeman had not acted with a specific intent to kill. Freeman has not identified a meaningful difference between the trial discussion of depression and his habeas discussion of Dysthymic Disorder, other than perhaps severity. Expert and lay testimony already told jurors that Freeman's depression was

longstanding, progressive, and debilitating. The jury had ample information that allowed it to take Freeman's depression into account. Dr. Brown also explained at trial how Freeman's alcohol abuse exacerbated his depressed state. Tr. Vol. 27 at 193–94, 201, 206–08. The jury had a sufficient basis to consider how depression and alcohol abuse combined to affect Freeman at both stages of trial.

The habeas evidence that was not also presented at trial consisted of the evidence about toxic chemical exposure and some family history of epilepsy, which led Freeman to posit for the first time that he had blacked out during the shooting. But the record shows no evidence in Freeman's own history of seizures or blackouts from any cause, including epilepsy or prolonged exposure to certain substances. Only Dr. Stone's habeas affidavit referred to seizures experienced by other family members, and possibly also by Freeman. The state habeas court, however, pointed out that Freeman's own statements, including to the psychological experts, showed that he remembered what he had done. Nothing in the record suggested that before trial, Freeman asserted or evidenced an inability to remember confronting the police, firing his weapons, or shooting the officer. The state habeas court similarly found that Freeman's claim about the effects of toxin exposure was speculative, given the absence of any evidence of blackouts in Freeman's own history or in his own recollection of the shooting.

Trial counsel investigated Freeman's background and retained three expert witnesses, all well-credentialed and experienced to evaluate different aspects of his mental health. All three of those experts interviewed and tested Freeman, found no serious neurological impairment or brain damage, and presented what conclusions they could about Freeman's state of mind. Neither their background nor their work on Freeman's behalf presented any basis for counsel to reject their analysis or conclusions as unreliable or inaccurate. With that investigation, trial counsel chose a

20

strategy using much, but not all, of the same information presented on habeas, and without any effort to argue that Freeman had blacked out because there was no evidence of this in the record of Freeman's history or his own accounts of the killing. The record presents no basis to find that trial counsel's strategy was unreasonable or unconstitutional.

"Judicial scrutiny . . . must be highly deferential" because "[i]t is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable." *Strickland*, 466 U.S. at 689. "There are countless ways to provide effective assistance in any given case," and "[e]ven the best criminal defense attorneys would not defend a particular client in the same way." *Id.* "[A] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* With that presumption, Freeman has not shown constitutional error in trial counsel's choice of defensive strategy. The state court was not unreasonable in finding constitutionally sufficient performance under the *Strickland* standard.

*Strickland* also requires a showing of actual prejudice. The state habeas court found that "Freeman's attorneys['] representation did not prejudice him." State Habeas Record at 429. Some of the new information presented on habeas was neither supported in the record nor reliable. Freeman neither submitted nor identified credible evidence that he blacked out, seized, or otherwise had no conscious control over his actions when he repeatedly fired at officers, killing one. Freeman has not shown that augmenting the trial evidence with the information presented on habeas would have led to a different outcome. Combined with the evidence at trial, the evidence on habeas was largely consistent and to the extent it was new, unsupported and contradicted by evidence that

21

Freeman remembered what had occurred and had been conscious and self-aware during the police encounter and shootings. *See Williams v. Taylor*, 529 U.S. 362, 397-98 (2000) (finding that, when considering *Strickland* prejudice, federal courts review "the totality of the available mitigation evidence — both that adduced at trial, and the evidence adduced in the habeas proceeding — in reweighing it against the evidence in aggravation").

Texas law presumes that evidence that a defendant shot a weapon allows a jury to find the requisite intent to kill. *See Godsey*, 719 S.W.2d at 581 ("If a deadly weapon is used in deadly manner, the inference is almost conclusive that he intended to kill."). Jurors heard extensive evidence about Freeman's assault and the many times he fired. With that evidence, added to the absence of evidence that Freeman had blacked out or seized during the shooting, the state habeas court could reasonably find that Freeman's postjudgment psychological evidence would not have given jurors a stronger reason to discount his intent to kill than the information presented by trial counsel. Whether under the trial defense of suicidal ideation or the habeas theory of diminished capacity, the jury still considered — and rejected — the argument that Freeman "jump[ed] out of the truck and start[ed] shooting . . . without any understanding . . . or thinking about the consequences of what he'[d] gotten himself into," or any consciousness or control of his actions. Tr. Vol. 27 at 198. Freeman has not shown a reasonable probability that the jury would not have convicted him of capital murder had trial counsel presented the theories Freeman presents on habeas review.

The state habeas court could also reasonably find that Freeman's evidence would not have resulted in different answers to the punishment-phase special issues. The state habeas court found that "[t]he evidence that Freeman has brought forth as part of his habeas application is insufficient to raise a reasonable probability that had it been presented to the jury a life sentence would have

resulted." State Habeas Record at 427. The Fifth Circuit has refused to find *Strickland* error when trial counsel presented the jurors with mitigating evidence — even if only in outline form — similar to the evidence that habeas counsel argues should have been presented differently or more fully. *See Coble v. Quarterman*, 496 F.3d 430, 437 (5th Cir. 2007); *Rodriguez v. Quarterman*, 204 F. App'x 489, 501 (5th Cir. 2006); *Alexander v. Quarterman*, 198 F. App'x 354, 359–60 (5th Cir. 2006); *Parr v. Quarterman*, 472 F.3d 245, 257–58 (5th Cir. 2006). A reviewing court "must be particularly wary of 'arguments that essentially come down to a matter of degrees. Did counsel investigate enough? Did counsel present enough mitigating evidence? Those questions are even less susceptible to judicial second-guessing.'" *Dowthitt v. Johnson*, 230 F.3d 733, 743 (5th Cir. 2000) (quoting *Kitchens v. Johnson*, 190 F.3d 698, 703 (5th Cir. 1999)). The evidence habeas counsel presented had a similar mitigating and defensive thrust to the evidence presented in the trial penalty phase. The difference is not sufficient to make trial counsel's performance during the penalty phase unconstitutional.

To the extent the evidence Freeman relies on in his federal habeas petition goes beyond what was presented at trial, the habeas evidence did not make it unreasonable for the state court to find no reasonable probability of a different result. The defense presented a detailed and robust punishment case. Trial counsel presented numerous witnesses to give jurors a clear picture of Freeman's life. The added emphasis or extent of the evidence presented in the habeas record was unlikely to change the outcome, and, as courts have recognized, could have backfired. Courts have recognized that evidence of alcohol abuse and inability to control anger, for example, can be double edged. *See Johnson v. Cockrell*, 306 F.3d 249, 253 (5th Cir. 2002); *West v. Johnson*, 92 F.3d 1385, 1409 (5th Cir. 1996) (discussing the aggravating effect of evidence of "anger and hostility within"

and "poor impulse control"). That is particularly true when, as here, the punishment phase emphasized the brutality of the defendant's offense and the qualities that would make him a future danger to society. Taken together, Freeman's habeas evidence does not call into question his future dangerousness or insert fundamentally different mitigating evidence in a way that would reasonably end in a life sentence. The state habeas court was not unreasonable in finding that Freeman had not met the *Strickland* actual prejudice standard.

Given the evidence trial counsel prepared and put before the jury, the state habeas court reasonably found no constitutional infirmity in trial counsel's representation. Freeman fails to show that the state court's decision was contrary to, or an unreasonable application of, federal law. *See* 28 U.S.C. § 2254(d)(1). He is not entitled to the habeas relief he seeks.

## VI.    Certificate of Appealability

The AEDPA bars appellate review of a habeas petition unless a district or circuit court certifies specific issues for appeal. *See* 28 U.S.C. § 2253(c); FED. R. APP. P. 22(b). Although Freeman has not sought a certificate of appealability ("COA"), a district court may decide on its own whether the circumstances justify an appeal before issuing a final judgment. *See* Rule 11, RULES GOVERNING SECTION 2254 CASES IN THE UNITED STATES DISTRICT COURTS; *see Alexander*, 211 F.3d at 898.

A COA may not issue unless "[the petitioner] has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2); *see also Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Settled precedent forecloses relief on Freeman's claim. Because Freeman has not shown under the appropriate standard that any issue deserves appellate review, this court will not certify any of his habeas claims for consideration by the Court of Appeals for the Fifth Circuit.

## VII. Conclusion

The court denies Freeman's petition for a writ of habeas corpus and declines to certify any issue for appellate review. This civil action is dismissed by separate order.

Signed on December 22, 2014, at Houston, Texas.

Lee H. Rosenthal
United States District Judge